### GILBERT v. THIERRY.
#### Civil Action No. 2631.

District Court, D. Massachusetts.
Oct. 25, 1944.

Judgment Affirmed Feb. 27, 1945.
See 147 F.2d 603.

William H. Lewis, Jr., of Boston, Mass., for plaintiff.

Albert E. Lewis and Louis S. Thierry, pro se, both of Boston, Mass., for defendant.

WYZANSKI, District Judge.

This case presents critical questions as to the rights of tenants and landlords under the regulations of the Office of Price Administration.

On the effective date of Maximum Rent Regulation 53, landlord Thierry was letting an apartment to tenant Thieme on a monthly basis at $50 a month. The landlord reported these facts to the OPA in his first registration statement. At that time the landlord was not supplying an electric refrigerator or any furniture. Tenant Thieme moved out, and then the landlord bought and installed an electric refrigerator. Thereupon he leased the premises and the refrigerator to tenant Gilbert for

238

one year and five months, beginning April 1, 1943, at $55 a month. Gilbert made nine monthly payments at the $55 rate. Then in January 1944 the landlord offered to refund for each of the 9 months $5 or a total of $45. On the advice of counsel the tenant stood out for $450 on the theory that Section 205(e) of the Emergency Price Control Act of 1942, 56 Stat. 23, 33, 50 U.S.C. A.Appendix § 925(e), gave him the right to recover minimum damages of $50 for each monthly overpayment of rent. Not receiving the $450, the tenant brought this suit on February 1, 1944.

Four issues of law are presented: (1) Is the landlord's acceptance of the payments a violation of a regulation of the OPA; (2) if so, does Section 205(e) of the Emergency Price Control Act of 1942, 56 Stat. 23, 33, 50 U.S.C.A.Appendix § 925(e), give the tenant a right to one action for three times $45 or to nine actions for $50 each; (3) does the landlord have a valid defense on the ground that prior to any action he tendered to the tenant $45; and (4) what is a "reasonable attorney's fee" in this case?

■ (1) The parties agree that the OPA issued on October 22, 1942, Maximum Rent Regulation 53, which established as a maximum rental for an unfurnished apartment in Middlesex County the rent charged for that apartment on March 1, 1942. Max-

imum Rent Regulation 53, §§ 1388.281 (29); 1388.284 (a).

But there is a dispute as to whether, in the absence of a special order of the OPA, this maximum applies to the same apartment after an electric refrigerator has been added. The landlord's position is that the electric refrigerator is a new "housing accommodation" as defined by § 1388.293 (a) (6), copied in the margin; [1] and that under § 1388.284 (e), copied in the margin,[2] the maximum for such a new housing accommodation is whatever the landlord charged the first time he rented it—at least until the OPA otherwise orders.[2] The tenant's position is that if the landlord wishes to charge for the apartment together with the refrigerator a higher rent than the maximum set for an unfurnished apartment, the landlord must, by petition, first secure the assent of the OPA for an upward adjustment of rent in accordance with § 1388.285, copied in the margin.[3]

I am quite clear that the tenant's interpretation of the regulation is correct. As the next two paragraphs show, it is supported both by the usual canons of documentary construction and by the underlying policy of the system of price control.

■ The regulation has general provisions governing all new housing accommodations, that is, § 1388.284(e); and it also has specific provisions governing new fur-

---

[1] Maximum Rent Regulation 53, § 1388.-293 (a), in a section headed "Definitions" provides that: "When used in this Maximum Rent Regulation No. 53: * * * (6) The term 'housing accommodation' means any building, structure, or part thereof, or land appurtenant thereto, or any other real or personal property rented or offered for rent for living or dwelling purposes, together with all privileges, services, furnishings, furniture, equipment, facilities and improvements connected with the use or occupancy of such property."

[2] Maximum Rent Regulation 53, § 1388.-284 (e), provides that "For * * * (3) housing accommodations not rented at any time between January 1, 1942 and such effective date [i. e. for Middlesex County, November 1, 1942], the first rent for such accommodations after the change or the effective date, as the case may be. Within 30 days after so renting the landlord shall register the accommodations as provided in § 1388.287. The Administrator may order a decrease in the maximum rent as provided in § 1388.285 (c)."

[3] Maximum Rent Regulation 53, § 1388.-285, provides that: "In the circumstances

enumerated in this section, the Administrator may issue an order changing the maximum rents otherwise allowable. * * * In those cases involving * * * an increase or decrease in the furniture, furnishings or equipment. * * * the adjustment in the maximum rent shall be the amount the Administrator finds would have been on March 1, 1942 the difference in the rental value of the housing accommodations by reason of such change. * * * (a) Any landlord may file a petition for adjustment to increase the maximum rent otherwise allowable, only on the grounds that: * * * (3) There has been a substantial increase in the services, furniture, furnishings or equipment provided with the housing accommodations since the date or order determining its maximum rent."

[The wording of the sections of the regulation quoted in the three preceding footnotes has been somewhat changed by amendments from time to time; but the differences are not significant in this controversy. See the codification of the regulation and 34 amendments published September 12, 1944. 8 F.R. 14663.]

niture and equipment, that is, § 1388.285. If the general provisions stood alone it would be arguable that because of the broad definition of "housing accommodations" given by § 1388.293(a), the draftsman intended to · embrace not only new buildings but new furniture. But that argument fails in the presence of the detailed and specific provisions applicable to new furniture. It is a well-settled canon of construction that, in order to give effect to every clause and part of a document, specific clauses prevail over repugnant general clauses, even though the general clauses are on their face sufficiently broad to cover the particular point in controversy. D. Ginsberg & Sons, Inc. v. Popkin, 285 U.S. 204, 208, 52 S.Ct. 322, 76 L.Ed. 704.

Moreover, the underlying policy of price control would be gravely handicapped if the landlord's construction of this regulation were accepted. Under his view if a landlord adds a $65 refrigerator, and until the OPA intervenes, he can over a period of 17 months charge $85 more rent than could have been charged under the previous ceiling. If this be sound, it is difficult to see why the addition of a $3 shower curtain or a $15 set of venetian blinds would not warrant a landlord in adding whatever he saw fit to the ceiling price, at least until such time as the agents of the OPA had time to check the reported increase, investigate it, hold hearings and enter a reduction order. Obviously a rent control scheme which had such convenient escape clauses would be of little practical value in stabilizing rents at the rates prevailing in the past. And so, if the present regulation is equally susceptible to two constructions one permitting, the other prohibiting, devices of the type mentioned, the fundamental purpose of the regulation compels the adoption of that construction which prohibits a landlord who has added one or two furnishings from raising the ceiling price

until he has the consent of the OPA. Taylor v. United States, 9 Cir., 142 F.2d 808 April 26, 1944.

■ (2) Having concluded that the landlord violated the regulation, the Court is faced with the question as to what is the tenant's measure of damages.

Inasmuch as the violations all occurred prior to June 30, 1944, Section 108(c) of the Stabilization Extension Act of 1944, 78th Congress, 2d Sess., c. 325, 50 U.S.C.A. Appendix § 925(c), provides that the rule of damages shall be prescribed not by Section 108(b) of that Act but by Section 205 (e) of the Emergency Price Control Act of 1942, 56 Stat. 23, 33, 50 U.S.C.A.Appendix § 925(e). Section 205(e) provides that:

"If any person selling a commodity violates a regulation * * * prescribing a maximum price * * * the person who buys such commodity for use or consumption other than in the course of trade or business may bring an action either for $50 or for treble the amount by which the consideration exceeded the applicable maximum price, whichever is the greater, plus reasonable attorney's fees and costs as determined by the court. For the purposes of this section the payment or receipt of rent for defense-area housing accommodations shall be deemed the buying or selling of a commodity, as the case may be. * * * Any suit or action under this subsection may be brought in any court of competent jurisdiction, and shall be instituted within one year after delivery is completed or rent is paid. * * *"

The tenant asserts that as applied to the facts of this case Section 205(e) gives him nine rights of action each for $50, that is, $450, plus attorney's fees and costs. The landlord contends it gives the tenant nine rights of action each for only three times $5, that is $135, plus attorney's fees and costs. There are authorities to support each position.[4]

---

[4] These authorities support the tenant: Lapinski v. Copacino, 131 Conn. 119, 38 A. 592 (each of 7 rental overpayments of $3 gives the tenant a cause of action for $50 or a total of $350); Beasley v. Gottlieb, 131 N.J.Law 117, 35 A.2d 49, (each of 2 rental overpayments of $6 gives the tenant a cause of action for $50 or a total of $100); Walters v. Melavas, N.J., Orange Dist.Ct., 1 Price Control Cases ¶ 51, 738 (each rental overpayment gives the tenant a cause of action for at least $50); Lewandowski v. Mirecki, Wisc., Milwaukee County Civ.Ct., 16 OPA Service 622.-326 (each of 12 rental overpayments of $2 gives the tenant a cause of action for $50 or a total of $600); Beck v. Foumal, Ore., Clackamas County Ct., 1 Price Control Cases ¶ 51,745 (each rental overpayment gives the tenant a cause of action for at least $50); Pratt et al. v. Hollenbeck, 1 Price Control Cases ¶ 51,752 (Pa. Ct. of Com. Pleas) (each of 17 rental overpayments gives the tenant a cause of action for $50, or a total of $850); Greer v. Sims, Cal. Justice's Ct., 1 Price Control

I am of opinion that the authorities which support the tenant's view correctly interpret the text and the policy of the statute.

The introductory clause of the first sentence of Section 205(e) refers to any person selling *a* commodity; the main clause gives the remedy to a person buying *such* commodity. Thus at the outset, and with reference to dealings in personal property, the text places a distributive construction upon business transactions. The sale of each separate commodity sold at an over-ceiling price gives rise to a liability of $50 or treble damages, whichever is greater. The second sentence then directs that "the payment or receipt of rent * * * shall be deemed the buying or selling of a commodity." This direction is to read the section as though it said in so many words that "if any person engages in the 'receipt of rent' above the ceiling, the person making the 'payment of rent' may bring an action for either $50 or treble damages." As used in this context the word "rent" has the same meaning it has in popular usage and in some technical usages. It means each separate payment made by a tenant to a landlord at a specified time for the use of the landlord's premises. Compare Oxford English Dictionary, vol. VIII, p. 451 meaning 2b. M. E. Blatt Co. v. United States, 305 U.S. 267, 277, 59 S.Ct. 186, 83 L.Ed. 167; Duffy v. Central R. Co., 268 U.S. 55, 63, 45 S.Ct. 429, 69 L.Ed. 846; Blackstone, Commentaries, vol. 2 pp. 41–43. It does not mean a single right to all the payments made upon a series of occasions in return for a continuous estate conveyed by the landlord. Compare 2 Washburn Real Property, 5th Ed., 284. Thus the distributive construction already adopted for transactions in personal property is applied to leases of real property. Each occasion when a person engages in the receipt of rent gives rise to a separate liability.

There is nothing unusual in the legislature affixing a separate liability to every repetition of a wrongful act. It is commonly done in criminal statutes. Blockburger v. United States, 284 U.S. 299, 301–303, 52 S.Ct. 180, 76 L.Ed. 306; Ebeling v. Morgan, 237 U.S. 625, 628, 35 S.Ct. 710, 59 L.Ed. 1151. And it is also done in qui tam statutes. United States ex rel. Marcus v. Hess, 317 U.S. 537, 552, 63 S.Ct. 379, 87 L.Ed. 443.

An interpretation of Section 205 (e) so as to impose similar separate liabilities is consistent with the underlying policy of both the Emergency Price Control Act as a whole and the particular section 205 (e). The Act as a whole establishes a far-flung scheme of price regulation to guard against inflationary price increases attributable to the world war. The scheme covers many retail prices, rents and like items of ordinary expenditure. So broad a regulatory program requires for its success not merely a spirit of obedience to law, patriotism and goodwill but also vigilant enforcement. As enforcement devices Congress has provided criminal proceedings, equitable and other civil remedies at the suit of the Administrator, administrative controls and actions by private persons. The section allowing private actions, Section 205(e), is obviously intended to do more than assure aggrieved persons a right to recover their losses from wrongdoers.[5] In allowing treble damages to an aggrieved

Cases ¶ 51,938 (each of 9 rental overpayments of $3.50 gives the tenant a cause of action for $50, or a total of $450). Compare Pringle v. Kofsky, (E.D.Pa.)* (where the maximum rental is $27.50 per month, and the tenant pays at the rate of $9 a week for 3 months, and at the rate of $36 a month for 11 months, the tenant has 14 causes of action each for $50, or a total of $700.)

These authorities support the landlord: McCowen v. Dumont, D.C., 54 F.Supp. 749 (for 24 overpayments of weekly rent tenant recovers $118.50); Link et al. v. Kallaos et al., D.C., 56 F.Supp. 304, 1 Price Control Cases ¶ 51,947 (for 12 overpayments of monthly rent tenant recovers $180);

Gordon v. Hochberg, 182 Misc. 117, 49 N.Y.S.2d 957 (for 3 overpayments of monthly rent tenant recovers $50); Ward v. Bochino, 181 Misc. 355, 46 N.Y.S.2d 54, (for 31 overpayments of weekly rent tenant recovers $50); Czaplinski v. Lee, Cal., Los Angeles Mun.Ct., 16 OPA Service 622.450 (for 8 overpayments of weekly rent tenant recovers $50); Davis v. Hogge, Va., Richmond, City Ct., 1 Price Control Cases ¶ 51,932 (for 5 overpayments of weekly rent tenant recovers $50); Whatley v. Love, La.App., 13 So.2d 719 (for 2 overpayments of monthly rent tenant recovers $50).

[5] No light is thrown on Section 205 (e) by the legislative debates or reports. At page 8 of Sen.Rep. No. 931, 77th Cong. 2nd Sess. (1942), p. 8, the Senate Com-

* No opinion for publication.

litigant, Congress adopted a technique (familiar to us through the Anti-Trust Acts and the Fair Labor Standards Act) which not only makes the aggrieved person whole, but also gives an interested person a reward for acting as an agent of law enforcement, deters potential violators by a threat of heavy damages and punishes actual violators by the imposition of substantial judgments. The treble damage provision is thus not only a remedial measure but in the nature of a limited qui tam action—the difference being that unlike the usual qui tam action this action can be brought only by a party who has been himself damaged. The $50 provision is designed with similar purposes. It is intended to be sufficiently attractive to stimulate an aggrieved person to recover his losses and to enforce the law; and it is also intended to be sufficiently burdensome to deter potential violators and to punish actual violators. That is, the $50 provision has a punitive purpose as well as a purpose of making certain that the plaintiff's recovery is adequate to repay him for the trouble of coming to court to recover his losses.

■ It is quite true that a qui tam recovery of this type often gives a windfall to persons with malevolent or disagreeable motives. Trial judges who see on the stand plaintiffs in these suits are perhaps especially aware of this characteristic of quit tam proceedings. And it is likewise true that the plaintiff in a qui tam proceeding may seek separate recoveries for each incident in a course of wrongful conduct, whereas ordinarily a public prosecutor would seek indictments for only a few selected incidents, and ordinarily a criminal judge would impose concurrent rather than cumulative or consecutive penalties. But those are considerations for Congress to weigh when determining whether to include in legislation qui tam remedies. The view of the federal judiciary (United States ex rel. Marcus v. Hess, 317 U.S. 537, 541, 552, 63 S.Ct. 379, 87 L.Ed. 443), unlike that of some state courts (Griffin v. Interurban St. R. Co., 180 N.Y. 538, 72 N. E. 1142; Gordon v. Hochberg, 182 Misc.

117, 49 N.Y.S.2d 957), is that if the legislature includes a qui tam provision it is to be enforced, like any other statutory provision, ungrudgingly and according to its spirit and its letter.

There remains to be considered one technical point which is adumbrated in Lapinski v. Copacino, 131 Conn. 119. 38 A.2d 592, and Schmidt v. Layman, Ohio, Summit County Ct. of Common Pleas, 1 Price Control Cases ¶ 51,888. Is the general rule of Section 205(e), that each separate receipt of rent in excess of the ceiling gives rise to a separate $50 liability, applicable to a case where the landlord makes a single lease for a term of months and each separate receipt is pursuant to that single contract?

The argument for an exception rests upon the quiddities of the law of landlord and tenant. From the days of Littleton to the present, where a lessor conveys to the lessee a term of months in consideration of the lessee's covenant to pay rent either at one time or in installments, this has been regarded by the courts as a single sale of a single estate by the lessor to the lessee, not as a combination of as many sales as there were months. Viterbo v. Friedlander, 120 U.S. 707, 712, 7 S.Ct. 962, 30 L.Ed. 776; Fowler v. Bott, 6 Mass. 63, 67. And this unitary aspect of the transaction is not altered even if the parties stipulate, as they did here, that the periodic payment of rent is a condition the breach of which entitles the landlord to terminate the lease. Fifty Associates v. Howland, 52 Mass. 99, 102. From this analysis of his lease the landlord argues that here we have the analog of a case where a person sells a commodity, say an automobile, at above the ceiling price, and the purchaser agrees to pay and does pay in 17 monthly installments. Such payments, the landlord says, would give rise to only one $50 recovery or treble damages, and the rule should be the same, he asserts, for successive instalments of rent payable under one lease.

To this argument the first answer is that the statute here involved has its avowed impact upon each separate receipt of rent, whereas in the case of personal property,

---

mittee which drafted the present form of the Act explained that "To discourage *initial* violations, the committee substitute provides for actions at law to recover $50 or three times the amount of the legal overcharges" (Italics added). The use of the word "initial" is perplexing. Despite the

words he used, the author can hardly have intended to say that both the $50 alternative and the treble damage alternative are available only against an initial violation. It seems more likely that the use of the word "initial" was inadvertent.

its avowed impact is upon the single sale of the commodity, not the separate receipts of parts of the purchase price. The second answer is that in the case at bar the landlord himself reported his maximum rent upon a monthly basis, not a yearly basis or a 17-month basis. Therefore he chose as his own base of calculation the monthly period and it is by that measuring rod he is to be charged. And finally it may be observed that an objection to the landlord's argument is that it would create grave doubt as to when the tenant's right accrued and when it was barred.

Before leaving this phase of the case I should add that I am not unmindful that in 1944 Congress amended this statute prospectively. That fact, however, is of no moment in interpreting the original act: the Congressional intent of 1944 may or may not have been the same as the Congressional intent of 1942; and, moreover, the use of an amendatory statute to interpret the original statute is contra-canonical.

 (3) The next issue is whether the tenant's rights are in any way affected by the landlord's tender to him of $45 to repay the overcharges.

Even if it be assumed that the landlord did not know he was violating the regulations at the time he collected the overpayments and that the landlord tendered restitution as soon as he learned of his error and without pressure from the OPA, nonetheless the tenant is entitled to the full statutory recovery. The tenant's rights accrue when the violation occurs and for the landlord there is no . locus poenitentiae. Zwang v. A. & P. Food Stores, 181 Misc. 375, 46 N.Y.S.2d 747, Grier v. Sims, Cal. Justice's Court, 1944, 1 Price Control Cases ¶ 51,938. Compare Bowles v. American Stores, Inc., 78 U.S.App.D.C. 238, 136 F. 2d 377. This doctrine is comparable to the rule under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. that where an employer has in good faith but erroneously paid less than the statutory wage, the employee has an indefeasible right to recover twice the underpayment. Overnight Motor Transportation Co., Inc. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682. So long as Congress deems it sound policy to give these rights without qualification, and counsel deem it desirable to press such rights on behalf of their clients, judges are under a duty to enforce them as written.

 (4) The final question is the amount allowable as counsel fees.

In this case no attempt was made to shorten the litigation by a motion for summary judgment under Rule 56 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, though that clearly would have been appropriate. No brief concisely summarizing the pertinent authorities was offered. No itemized schedule of time spent was filed. Under these circumstances, and in accordance with the criteria referred to in Hutchinson v. William C. Barry Inc., D.C., 50 F.Supp. 292, 298, counsel fees in the amount of $75 are allowed.

This award is without prejudice to whatever rights the plaintiff may have for additional counsel fees in the event that an appeal is taken to a higher court. Compare Aucoin v. Mystic Waste Co., D.C., 55 F. Supp. 672, 673, 674.

Judgment for plaintiff for $525 and costs.