**FLEMING, Temporary Controls Adm'r, v.
VAN DER LOO.**

No. 9504.

United States Court of Appeals
District of Columbia.

Submitted March 17, 1947.*
Decided March 24, 1947.

---

* The case was here first as No. 9324 and was argued January 7, 1947. — U.S. App.D.C. —, 160 F.2d 905. Remanded because premature, it was reappealed and by stipulation submitted upon the briefs and argument already had.

don, Director, Litigation Division, and Mr. Albert M. Dreyer, Chief, Appellate Branch, both of Office of Price Administration Branch, Office of Temporary Controls, both of Washington, D. C., were on the brief, for appellant.

Mr. J. Grahame Walker, of Washington, D. C., District Enforcement Attorney, Office of Price Administration, District of Columbia, at the time the brief was filed, was also on the brief for appellant.

Mr. John L. Laskey, of Washington, D. C., with whom Mr. William S. Tarver, of Washington, D. C., was on the brief, for appellee.

Before GRONER, Chief Justice, and WILBUR K. MILLER and PRETTY-MAN, Associate Justices.

PRETTYMAN, Associate Justice.

The Price Administrator, who was appellant's predecessor as a party to this case,[1] brought a civil action in the District Court praying for an injunction against appellee's selling garments at prices higher than ceiling prices permitted by Maximum Price Regulation 330, and for damages of $16,579.71, which sum was three times the amount of alleged overcharges, that is, sales prices in excess of legal ceiling prices. The action was based upon Section 205 of the Emergency Price Control Act of 1942, as amended by the Act of June 30, 1944.[2] Trial was had before the court without a jury. The court entered a final decree for permanent injunction, and entered judgment for defendant upon the claim for damages. The Administrator appealed from the latter judgment.

Appellee Van Der Loo was in the business of selling women's outerwear garments at retail. She purchased garments at many cost prices, which varied only slightly one from the other; for example, she bought dresses at $8.75, $9.75, $10.75, $11.75, etc. The garments bought at each cost price were called a "cost price line". In the spring and summer of 1941 her store was

Mrs. Rose Mary Filipowicz, Attorney, Office of Price Administration Branch, Office of Temporary Controls, of Washington, D. C., with whom Mr. David Lon-

---

[1] A motion to substitute the Temporary Controls Administrator in the place of the Price Administrator in this case was made and granted in this court without objection by appellee. The propriety of such substitution over objection is pending before the Supreme Court of the United States in Porter v. Mohawk Wrecking and Lumber Co., 67 S.Ct. 1129.

[2] 56 Stat. 33, 58 Stat. 640, 50 U.S.C.A. Appendix, § 925.

overstocked and she had on hand a number of damaged and faded garments. She conducted a clearance sale at reductions from 35 to 60 percent of her initially-intended prices. It thus happened that a majority of the garments which she sold in several "cost price lines" during August-December, 1941, were sold at prices below cost.

In September, 1944, the Administrator promulgated Revised Maximum Price Regulation 330.[3] In pertinent part it provided: "You find your ceiling price under this regulation by calculating the markup which you took on garments you delivered during the 'base period', and then applying that markup to the cost of the garments you are pricing. * * *

\* \* \* \* \*

"* * * The 'base period' for retailers is the period between August 1 and December 31, 1941; * * *

\* \* \* \* \*

"* * * In order to price under this regulation you must have a pricing chart. * * *

"* * * Each pricing chart must contain the following:

\* \* \* \* \* \*

"(5) A list of the cost prices at which you purchased garments in each of these categories. * * *

\* \* \* \* \*

"(7) The selling price at which you delivered, during the base period, the largest number of garments of each cost price listed in (5). * * *

"(8) The percentage markup taken on each selling price listed in 7.

\* \* \* \* \*

"(1) *Rule 1.* * * * The ceiling price for a garment which has a cost to you the same as a cost price listed for that category on your pricing chart is the selling price listed for that cost price on your chart.

\* \* \* \* \*

"(2) *Rule 2.* * * *

\* \* \* \* \*

"(iii) * * * Your ceiling price for a garment whose cost is between the lowest and the highest cost price listed on your pricing chart for the same category, but is not the same as any cost price listed on the chart for that category, is calculated by applying to the cost of the garment you are pricing, the percentage markup listed on your pricing chart for the next lower cost price in that category. * * *"

The regulation gave an example of the operation of this latter rule as follows:

"*For example:* You want to find your ceiling price for women's dresses (Category 21) that you now buy at $7.75. On your pricing chart you have listed women's dresses at cost prices of $6.75 and $8.75, but none at $7.75. To calculate your ceiling price you take the percentage markup listed on your chart for women's dresses costing $6.75. This is 38.4%. You apply this markup to your cost of $7.75 and find that your ceiling price is $12.58. * * *"

A sample of a retailer's pricing chart was also given in the regulation. Each selling price shown on the sample chart was in excess of the cost price, and each cost price line showed the percentage of this increase of selling price over cost. The instructions with the chart told the retailer to compute markups by subtracting cost from selling price.

Mrs. Van Der Loo prepared and filed a pricing chart, following the provision of the regulation, as above quoted, "You find your ceiling price under this regulation by calculating the markup which you took on garments you delivered during the 'base period', * * *" She entered on the chart all the cost price lines as to which she had "markups". Thus, for example, she entered cost prices of $22.75, $23.75, $26.75, and $27.75 and showed the ceiling prices and the percentage markups on each such line. She had had in the base period a line of dresses costing $25.00, which had been involved in the clearance sale, and it happened that the greatest number of such garments sold by her during that time had been sold at $15.00 each. She did not enter on her chart the selling price at which she delivered during the base period the largest

---

[3] This regulation was originally issued February 18, 1943. 8 F.R. 2209. The revision was a redraft with some amendments. 9 F.R. 11350.

number of dresses in the $25.00 cost price line. She fixed the ceiling price of garments costing her $25.00 by using Rule 2(iii), above quoted; that is, by applying to that cost the markup of the next lower cost price line ($23.75) shown on her pricing chart.

The local Office of Price Administration advised her that this chart was unsatisfactory, but we are not told whether any reasons were assigned or corrections suggested. Thereupon Mrs. Van Der Loo employed a firm of accountants which had advertised as having experience in the preparation of pricing charts, and they prepared a chart. This chart also was pronounced unsatisfactory by the Price Administrator; the record does not disclose whether she was advised as to the respects in which it was unsatisfactory. Mrs. Van Der Loo then employed a firm of attorneys, eminent at the bar and thoroughly familiar with price administration. These attorneys prepared another pricing chart, in which they followed the same principle as that followed by Mrs. Van Der Loo in the first instance. At the same time, the attorneys requested from the Administrator an interpretation of the regulation in respect to base-period sales below cost.

On April 25, 1945, the District Price Attorney in the local Office of Price Administration advised the attorneys by letter that the chart must show the selling price at which the retailer delivered during the base period the largest number of units of each cost price line, even if such selling price was below cost; that the retailer could not use Rule 2 to compute a ceiling price in such instances; that the only relief would be to discontinue the particular line of garments, and that there was no provision for an adjustment under this regulation. Thereupon counsel prepared another pricing chart, following that ruling. Thus, for example, this last chart (called Price Chart IV in this litigation) showed a cost price line of dresses at $25.00, in which the selling price for the greatest number of articles sold during the base period was $15.00. The effect was to fix permanently a ceiling price of $15.00 on all dresses purchased by Mrs. Van Der Loo for $25.00. At the same time, the proper and legal ceiling price on dresses purchased by her for $23.75 or for $26.75 was $45.00, as shown by this same chart.

Thereupon the Administrator initiated the present proceeding. The overcharges which he alleged as the basis of his claim for damages were based in major part[4] upon sales at prices which were computed by Rule 2 (iii) and which were above the selling prices shown on the final chart as having been below cost, due to the circumstances we have related.

The parties agreed below that the memorandum opinion of the District Court should serve as its findings of fact and conclusions of law. 71 F.Supp. 242. In that opinion the court said:

"I find the respondent, despite what might be termed slipshod business practice, has acted in good faith and made an honest effort to comply, and, as a consequence, should not be held liable in damages."

The opinion did not contain any finding or statement that Mrs. Van Der Loo had violated the regulation. In respect to the injunction phase of the case, the court concluded "that until administrative determination is made of respondent's protest, Price Chart IV, so-called, is to be deemed valid, in full force and effect, and the respondent enjoined from violation of the same."

 This appellee was liable for damages only if she had violated the regulation.[5] The District Court did not make a finding of violation. The Administrator did not object to that failure but, on the contrary, agreed that the memorandum opinion should serve as the finding. While it was not necessary that he request a finding,[6] it was necessary that he make known to the court his objection to the action taken by it and state the grounds of the objection.[7] If the Administrator had any objection to the findings announced by the District Court, such objection should have

---

[4] Only these sales are discussed by appellant in his briefs here.

[5] Sec. 205(e) of the Act.

[6] Rule 52(a), Federal Rules Civil Procedure, 28 U.S.C.A. following section 723c.

[7] Rule 46, Federal Rules Civil Procedure.

been registered with that court. We are asked to discover in the memorandum opinion a finding of violation. Appellant tells us that "The thought which consistently runs through the entire decision is that the violations charged had been proven" and that, in effect, the opinion of the court was a finding of violation. On the other hand, the court specifically declined to give judgment for damages, although, under the mandate of Section 205(e) of the Act, it would have awarded damages if it had found that Mrs. Van Der Loo had violated the regulation. A prior violation was not a necessary prerequisite to the injunction.[8] A finding of violation was obviously the heart of the claim for damages. The failure of the court to make the finding for which the Administrator was contending was notable upon the most cursory view of the court's memorandum. Since the Administrator was the plaintiff there, it was incumbent upon him to object to the court's failure to make such a finding, if he wished to premise an appeal upon the trial court's failure to adjudge damages for the violation.

The foregoing is sufficient to dispose of the appeal, but the nature of the contentions made to us compels some further observations.

Two succeeding paragraphs of the same section of the statute are pertinent.[9] Paragraph (d) says that no person shall be liable for damages for anything done "in good faith pursuant to * * * any regulation, * * * notwithstanding that subsequently such * * * regulation * * * may be modified, rescinded, or determined to be invalid." Paragraph (e) of the same section provides that if a person "violates" a regulation he shall be liable for damages not less than the amount of the overcharge, even if the violation was neither willful nor the result of failure to take practicable precautions against the occurrence of the violation.

The provision in paragraph (d) that damages shall not lie for an act done in good faith pursuant to a regulation even if that regulation be subsequently modified, is striking. One would assume that damages would not lie under those circumstances without any such statutory prohibition. The insertion of the novel precaution serves to emphasize that a modification of a regulation does not carry retroactively

---

[8] Sec. 205(a) of the Act.

[9] Sec. 205, pars. (d) and (e), of the Act.

"(d) No person shall be held liable for damages or penalties in any Federal, State, or Territorial court, on any grounds for or in respect of anything done or omitted to be done in good faith pursuant to any provision of this Act or any regulation, order, price schedule, requirement, or agreement thereunder, or under any price schedule of the Administrator of the Office of Price Administration or of the Administrator of the Office of Price Administration and Civilian Supply, notwithstanding that subsequently such provision, regulation, order, price schedule, requirement, or agreement may be modified, rescinded, or determined to be invalid. * * *

"(e) If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum, prices, the person who buys such commodity for use or consumption other than in the course of trade or business may, within one year from the date of the occurrence of the violation, except as hereinafter provided, bring an action against the seller on account of the overcharge. In such action, the seller shall

be liable for reasonable attorney's fees and costs as determined by the court, plus whichever of the following sums is the greater: (1) Such amount not more than three times the amount of the overcharge, or the overcharges, upon which the action is based as the court in its discretion may determine, or (2) an amount not less than $25 nor more than $50, as the court in its discretion may determine: *Provided, however*, That such amount shall be the amount of the overcharge or overcharges * * * if the defendant proves that the violation of the regulation, order, or price schedule in question was neither willfull nor the result of failure to take practicable precautions against the occurrence of the violation. * * * If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum prices, and the buyer either fails to institute an action under this subsection within thirty days from the date of the occurrence of the violation or is not entitled for any reason to bring the action, the Administrator may institute such action on behalf of the United States within such one-year period. * * *"

a liability for damages. That provision makes necessary a sharp distinction between a mere interpretation by the Administrator and a modification by him of a regulation. Moreover, when the statute refers to an act in good faith pursuant to a regulation, it seems to contemplate the contingency of a doubt as to the meaning of the regulation. If the meaning be certain, and an act be pursuant to it, no requirement of good faith would seem to be requisite to non-liability. The requirement that an act "pursuant to" a regulation be in good faith has significance only if the meaning of the regulation be uncertain. Thus it appears that if one acted according to what was in all good faith the apparent meaning of a regulation, damages will not lie. The emphasis here must be on the good faith. The statute does not permit the conjuring up of a possible meaning as a protection. Full effect must be given the stringent requirements of paragraph (e) relating to violations, but equally full effect must be given to paragraph (d).

The District Court found as a fact that Mrs. Van Der Loo acted in good faith. No dispute is offered to that finding. The Administrator says that his ruling of April 25, 1945, was an interpretation of the regulation; that it was a proper interpretation, and that, therefore, any deviation from it was, from the beginning, a violation.

Section 2 of the regulation was headed "How to find your ceiling prices under this regulation". It plainly directed retailers to compute their ceiling prices by applying "markups". To the ordinary person, and likewise in the dictionaries, "markup" indicates a price above cost. We are told by the Administrator that in the trade a "markup" may be either plus or minus. But the record does not show that to be the case, and we are referred to no authority which does. Webster's New International Dictionary gives the meaning of the word in commerce as "the amount added to the cost price in figuring a selling price to cover overhead and profit." Without evidence or authority of a trade usage to the contrary, it would be a tortured interpretation of "markup" to say that it meant a price below cost. Moreover, as we have pointed out, the regulation contained a sample pricing chart, and that chart included no sales below cost. Every cost line shown by it had a sales price above cost, and hence a markup. The detailed instructions which accompanied the sample chart told the retailer:

"Step 1. You subtract the cost price (Column B) from the selling price line (Column D) and the difference is the dollar markup.

"Step 2. Divide this dollar markup by the selling price line (Column D) and the result is the percentage markup."

Thus, the instruction was specific that a markup was a price above cost, calculated by deducting cost from selling price.

The Administrator says that the regulation required that the first column of a pricing chart contain every cost price line, and that the ensuing computations and results automatically followed. It is true that the regulation required a list of the cost prices at which the retailer purchased garments, but the final computation required on the chart was "the percentage markup taken on each selling price", and the instruction as to "How to find your ceiling prices" was an unqualified "You find your ceiling price under this regulation by calculating the markup which you took on garments you delivered during the 'base period', and then applying that markup to the cost of the garments you are pricing."

█ No basic concept of price control gives warning that the Administrator must have meant that sales below cost, by the accident of clearance sales in the base period, should be perpetuated. The retailer's cost was the wholesaler's selling price, and that price had a ceiling fixed by the Administrator's regulations. If the wholesaler's price be not violative of the requirements of price control, no reason would dictate that the retailer take a loss on that price. Any concept of price control would necessarily contemplate that prices at one level would follow through in normal course in ascending grades to the consumer. This is simple sense. So that a student of these regulations, observing the failure to mention sales prices below cost in the base period, would readily and reasonably conclude that the Administrator meant that ceilings in cost price lines where sales below cost

had predominated in the base period should be fixed by the rule applicable where no sales of that line had occurred in that period. In the language of the regulation, he could reasonably conclude that the Administrator meant that such ceilings were to be fixed by Rule 2(iii). It was reasonable that sales below cost be treated as no sales.

Furthermore, the Administrator himself later amended the regulation[10] to cure this conceded anomaly. And when he did so, he announced that a nationwide survey showed that the number of these abnormally low markup relationships was sufficiently small to preclude any possibility of a general price rise resulting from the action taken in the amendment.[11] He pointed out that these retailers had been unable to purchase merchandise because of the clearance sale retail price they would have to use. In the amendment he promulgated a rule not only for the relief from base-period sales below cost but for all base-period markups more than 20 percentage points below the average for the category. This was his view of what had to be done, and what was reasonable to do, as he looked at the results of his interpretation of the revised regulation.

The Administrator's position in the case at bar is the barest technicality. He admits that if Mrs. Van Der Loo bought a dress at $23.75, she could properly sell it at $45.00, and that if she bought one at $26.75, she could sell it at the same $45.00. Moreover, under his contention, if she bought a dress at $24.75, she could sell it at $46.88 because, since no $24.75 cost appeared in the first column of the approved Chart IV, she could compute the ceiling under Rule 2(iii), so that the percentage markup of the next lower cost price line (in this instance $23.75, for which the percentage markup was 47.2%[12]) would apply. But, he says, if she bought a dress at $25.00, she must sell it at not more than $15.00

■ The Administrator's ruling here in-

volved was in the form of a letter written in this particular case by a local enforcement officer. Technically it automatically became an official act of the Administrator by operation of a general procedural rule of his office. But it was not a published ruling, nor, so far as the record shows, was it public. It was not an administrative interpretation of long standing but was made after this controversy had arisen; was written two years after MPR 330 was issued, and was thereafter nullified by Amendment No. 5. Thus, it does not carry the great weight of presumptive validity which attaches to long-continued, consistent, published administrative rulings.

The Administrator says that his letter to Mrs. Van Der Loo was an interpretation. But if, in fact, it was a change in meaning, it was a modification. He had power either to interpret or to amend.[13] But the statute gives a vast difference of effect to the two actions. If he merely interprets, good faith in a contravening sale by a retailer may be no defense to damages. But if the Administrator really changed the meaning of the regulation, he could not thereby render liable to damages a retailer who in good faith had theretofore pursued the original regulation.

■ The District Court gave appellee the benefit of her clear good faith and so, in effect, held that she was not "violating" the regulation; that in following what was both its letter and its sense, she was acting pursuant to it within the meaning of the two pertinent paragraphs of the statute. We agree with that view. The ordinary meaning of "markup" does not include a sale below cost, and that ordinary meaning is consistent with the purpose of the Act and with the later thought of the Administrator. We think it was the meaning of the regulation, and that the "interpretation" was really a change in meaning.

The question is not whether the ruling

---

10 Amendment No. 5, issued April 11, 1946. 11 F.R. 4035.

11 Statement of Considerations Involved in the Issuance of Amendment No. 5 to RMPR 330, filed with the Division of the Federal Register April 11, 1946.

12 The instructions in the regulation were to compute a markup as its per-

centage of selling price, instead of cost, with permission to compute it on cost if the retailer used the latter method in the base period. An algebraic formula is necessary, to compute a price under the former method.

13 Sec. 204(a) of the Act, 50 U.S.C.A. Appendix, § 924(a).

of the Administrator was valid prospectively as an administrative regulation. The question is whether it was so clear a translation of the terms of the original regulation as to render retroactively the prices of this retailer a violation of that regulation.

We are cited to Bowles v. Seminole Rock Co., 1945, 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700. In that case the Supreme Court first read the regulation and ascertained the meaning thus revealed. It found a clear meaning in the words used. It then considered a series of public administrative rulings made concurrently with the regulation. The claim initially made for treble damages was not before the Court, only the injunction being involved there. The opposites of all these features are in the case at bar.

In his brief the Administrator tells us that Mrs. Van Der Loo's interpretation would leave "her at liberty to handle such cost price lines thereafter free from price control." Of course, neither her action nor her contention remotely suggests any such result. She applied Rule 2(iii) of the Administrator's regulation to these items, instead of Rule 1. Rule 2(iii) does not afford freedom from price control.

Some reference has been made to Mrs. Van Der Loo's case before the Emergency Court of Appeals.[14] She protested the validity of the regulation as interpreted by the letter of April 25, 1945. Her protest being denied, she appealed to the Emergency Court of Appeals. In respect to interpretation, that court concluded that the District Court had interpreted the regulation as limiting complainant in some instances to ceiling prices at or below cost. It said that it would accept an interpretation made by a District Court and proceeded to the question of validity. The District Court, however, as we have already said, did not make an interpretation but, for injunction purposes, held that "until administrative determination is made of respondent's protest, Price Chart IV, so-called, is to be deemed valid". It merely accepted the Administrator's interpretation for the purpose of the injunction and pend-

ing the decision of the Emergency Court of Appeals. Thus, Mrs. Van Der Loo seems to have had no judicial decision upon her contention as to the proper interpretation of the regulation.

Affirmed.

---

[14] Van Der Loo v. Porter, Em.App., 160 F.2d 110, certiorari denied, 67 S.Ct. 193.