**MASSY v. UNITED STATES.**
No. 14658.

United States Court of Appeals,
Eighth Circuit.

July 12, 1954.

Rehearing Denied Aug. 11, 1954.

---

Thomas Vennum (Vennum, Newhall & Ackman, Minneapolis, Minn., on the brief), for appellant.

Alex Dim, Asst. U. S. Atty., St. Paul, Minn. (George E. MacKinnon, U. S. Atty., St. Paul, Minn., George A. Fruit, Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and THOMAS, Circuit Judges.

GARDNER, Chief Judge.

This was an action brought by the government against James F. Massy, doing business as Massy Motors, to recover treble damages because of the sale by him of thirty-four automobiles at prices exceeding the ceiling prices fixed by General Ceiling Price Regulation, Supplementary Regulation 5. We shall refer to the parties as they were designated below. At all times pertinent to the issues here involved defendant was a dealer in automobiles at Little Falls, Minnesota, and as a part of his business he sold, serviced and repaired automobiles, accessories and equipment. The sales in controversy were alleged to have been made during a period from April 4, 1951 to October 14, 1951. The amount of excess in sales prices sought to be recovered was $1,116.-95. The alleged excess charges were for optional accessories and equipment provided with new 1951 Ford passenger automobiles sold and delivered during that period. These optional accessories and equipment consisted of six tube radios, fresh air heaters, turn signals, overdrive units and Fordomatic transmissions. In calculating the price or charge to be made for the optional equipment and accessories defendant added to the factory or list price a charge for adjustment or installation and it was the claim of the government that such a charge for services could not properly be added to the selling price of the car equipped therewith. In determining the price at which defendant sold automobiles during the so-called base period from December 19, 1950 to January 25, 1951, defendant customarily added to the factory or list price of these optional accessories a charge for services in connection with their installation and added the same to the price at which the cars were sold and this apparently has been his practice ever since.

From March 2, 1951 to October 15, 1951 Supplementary Regulation 5 to General Ceiling Price Regulation was in full force and effect. So far as here pertinent this regulation provides as follows:

"Sec. 3. Ceiling prices for new automobiles. The ceiling delivered price for a new automobile for sale at retail shall be the sum of the following items:

"(a) The manufacturer's suggested list price in effect prior to January 26, 1951. If the car is a new model for which the manufacturer had not published a list price prior to January 26, 1951, the suggested list price which the manufacturer first publishes after January 26, 1951 may be used.

"(b) A charge for any extra, special or optional equipment requested by the customer in writing and attached to the automobile (this charge shall not exceed the manufacturer's suggested list price for the equipment or the suggested list price of the producer of the equipment, as the case may be, in effect on January 26, 1951, but may include the ceiling price established under the General Ceiling Price Regulation for installation of the equipment, if a charge for installation was customarily made during the period December 19, 1950 to January 25, 1951, inclusive).

"(c)    *    *    *

"(d)    *    *    *

"(e)    *    *    *

"(f) The ceiling price established under the General Ceiling Price Regulation for preparing and conditioning the new automobile for delivery.

"(g)    *    *    *

"The ceiling delivered price established by this section is the price for sales for cash. The dealer may sell on other terms when requested in writing by the purchaser. Any device by which the seller increases his total realization on the sale of a new automobile over his total realization on the sale of the same model during the period December 19, 1950 to Jan-

uary 25, 1951, inclusive, is an evasion of this regulation (such a device, for instance, would be a decrease in the allowance for a used car, if any, taken in trade, below its reasonable value to the dealer, which value should be related to the ceiling price for the used car established by Section 4)."

There was evidence that the optional equipment and accessories here involved when received by defendant were attached to and were a part of the automobiles which he ultimately sold. In support of its contention that these accessories and equipment were installed by the factory before shipment to the dealer the government called an expert witness who, referring to such equipment and accessories as are here involved, testified that, "Merchandise sold the dealer by the manufacturer leaves the factory in 'commercially acceptable quality.' This does not mean acceptable to the customer, but rather acceptable for delivery to the dealer. On almost all accessories in the basic car, they are not 100 per cent ready to go at the time of delivery to dealers." There was testimony on behalf of defendant showing the condition of these various accessories when received by the defendant and what service was performed in making their installation satisfactory to the customer. There was no controversy as to the extent or value of the services or labor so performed.

The defendant produced expert witnesses and offered to prove by them that in the sale of the cars in controversy used cars were taken as part of the purchase price and defendant offered to prove as to each transaction or sale what the actual cash value of the used car was at the time of the transaction and sought by this testimony to prove that the used cars were taken by defendant as a part of the purchase price at an amount in excess of their actual cash value. The evidence was rejected as being incompetent, irrelevant and immaterial. The testimony will be further developed in the course of this opinion.

At the close of all the testimony defendant moved for a directed verdict in his favor except for the sum of $258.33 which he conceded to be due. The motion was denied and plaintiff's motion for a directed verdict in its favor for the sum of $1,116.95 was granted, the court having held that as a matter of law on the undisputed evidence plaintiff was entitled to recover the basic amount of the alleged excess charges but was not entitled to treble damages.

Defendant in seeking reversal contends:

1. The Court erred in sustaining plaintiff's motion for a directed verdict and in denying defendant's motion for a directed verdict.

2. The Court erred in removing from jury determination the fact issue relating to defendant's installation of "factory installed" accessories.

3. The Court erred in sustaining objection to defendant's offer of proof as to his charges for installation of accessories prior to the Korean conflict.

4. The Court erred in sustaining objection to defendant's offer of proof concerning the value of used cars taken by defendant in trade in the sales of new cars.

It was the contention of the government in the trial court and it renews that contention here that as the optional equipment and accessories were what is referred to as "factory installed" at the time the basic car was received by defendant no charge could be made by him for any services performed in connection with the installation of these accessories and it was on this theory that the trial court directed a verdict in favor of the government. While this equipment was attached to and placed in the basic car at the factory confessedly it was not installed in the sense that it could properly or safely function without further service to perfect the installation. The government's expert witness made it clear that the so-called installation at the factory was not an installation so far as the purchaser was concerned. The term "installed" has been variously defined. Thus, the term has been defined by

Webster's New International Dictionary, Second Edition, as follows: "setting up or placing in position for service or use." This definition finds support in adjudicated cases. Long v. Ulmer Machinery Co., 77 Cal.App. 66, 246 P. 113; Bracy Bros. Hardware Co. v. Herman-McCain Const. Co., 163 Ark. 133, 259 S.W. 384; Metzler v. Thye, 163 Cal. 95, 124 P. 721. In Long v. Ulmer Machinery Co., supra [77 Cal.App. 66, 246 P. 116], the court in defining the meaning of the word "installation" among other things said: "Installation means, as we understand the word, to place machinery in that position where it will reasonably accomplish the purposes for which it is set up." The Supreme Court of Arkansas [163 Ark. 133, 259 S.W. 386] in considering a contract to "install" certain equipment held that it was the duty of the contractor " * * * to deliver and install the equipment; that is, to set the same in place, connect it up, and fix it ready for use."

Under the undisputed evidence the optional equipment here in controversy was not, when it was received by defendant, so embodied and adjusted in the car that it would reasonably accomplish the purpose for which it was designed; in other words, it was not "ready for use." The so-called "factory installation" was at best a partially completed work which had to be finished by the dealer before it became an installed part of the basic car so far as the purchaser, who was the person for whose use it was intended, was concerned.

It was not the purpose of Supplementary Regulation 5 nor of other similar regulations to lower ceiling prices but to prevent their being raised above a standard prevailing during the so-called base period. This is made clear by the "Statement of Considerations" printed as a part of this Supplementary Regulation 5. These read in part as follows:

"During the base period established by the General Ceiling Price Regulation, many retail dealers in new automobiles were not following any uniform practice in fixing the delivered prices of new automobiles. Some dealers added arbitrary amounts to the manufacturer's suggested retail price. Others increased the charge for services supplied in preparing the automobile for delivery. Still others increased their charges for miscellaneous services, such as undercoating, glazing, etc. As a result, the ceiling prices for new automobiles do not reflect the substantial uniformity of pricing in the same geographical area that customarily existed. * * * The formula prices established by this regulation effect no substantial change in the general level of prices for new automobiles established by the General Ceiling Price Regulation. * * * No formal consultations with representatives of the industry have been possible because of the urgency of the situation. The regulation, however, will serve as an interim measure until a permanent industry regulation can be prepared with the advice of representatives of the industry and put into effect."

The evidence stands without dispute that the defendant made the same charges for installing this character of equipment during the base period as were made by him during the times here in controversy and, as already observed, the charges made were no greater nor different than those made by him during the base period. Similar charges were made by all other dealers in the same geographic area both during the base period and during the times here involved. The services or labor performed was substantial. Thus, on the six tube radios, the time necessary for such work varied from 1½ to 3 hours per unit, which included installing on the car items such as aerial and wiring which were not attached to the car when received from the manufacturer. On fresh air heaters the work required was from 2 to 4 hours per unit. Labor on turn signals varied in each case from 1 to 2 hours. The overdrive units required from 1½ to 4 hours. The Fordomatic transmissions took from 3 to 3½ hours of the mechanic's time.

Section 3(b) of Supplementary Regulation 5 provides as follows:

"A charge for any extra, special or optional equipment requested by the customer in writing and attached to the automobile (this charge shall not exceed the manufacturer's suggested list price for the equipment or the suggested list price of the producer of the equipment, as the case may be, in effect on January 26, 1951, but may include the ceiling price established under the General Ceiling Price Regulation for installation of the equipment, if a charge for installation was customarily made during the period December 19, 1950 to January 25, 1951, inclusive)."

Manifestly, it was not the purpose of the regulation to lower ceiling prices below those prevailing during the base period but to stabilize them at the level maintained during that period and it appearing without dispute that during that period he customarily made the charges here in controversy we conclude that they were not improper.

■ Certain so-called "interpretations" of the regulation as applied to the controversy were urged upon the trial court as persuasive, if indeed not conclusive. We think they did not have the usual attributes of interpretations. They were issued after this regulation ceased to be in effect and one of them was not issued until this action was being tried. They were not published in the Federal Register nor otherwise communicated to defendant or other dealers similarly situated and cannot, we think, be accepted as reflecting an administrative practice. Southern Goods Corporation v. Bowles, 4 Cir., 158 F.2d 587; Fleming v. Van Der Loo, 82 U.S.App.D.C. 400, 160 F.2d 906; Bowles v. Simon, 7 Cir., 145 F.2d 334. What is said by the United States Court of Appeals for the District of Columbia in Fleming v. Van Der Loo, supra [160 F.2d 912], is here peculiarly apposite:

"The Administrator's ruling here involved was in the form of a letter written in this particular case by a local enforcement officer. Technically it automatically became an official act of the Administrator by operation of a general procedural rule of his office. But it was not a pub-

lished ruling, nor, so far as the record shows, was it public. It was not an administrative interpretation of long standing but was made after this controversy had arisen; was written two years after MPR 330 was issued, and was thereafter nullified by Amendment No. 5. Thus, it does not carry the great weight of presumptive validity which attaches to long-continued, consistent, published administrative rulings."

Similarly, the United States Court of Appeals for the Seventh Circuit in Bowles v. Simon, supra [145 F.2d 337], said:

"We do not accept the Administrator's view that he may promulgate a regulation and then place on it an interpretation which becomes controlling on the courts. The Administrator has not grown to any such stature. The courts may consider his interpretations and follow them, if correct, but the court is not bound to follow them."

These so-called "interpretations", in the circumstances here disclosed, were entitled to no more weight nor persuasiveness than the argument of counsel appearing in the case.

■ This action was brought by the government pursuant to the provisions of the Defense Production Act of 1950, as amended, 50 U.S.C.A.Appendix, §§ 2061-2166, and the regulations issued thereunder, to recover treble damages. The statute is penal in character. Bowles v. Farmers Nat. Bank of Lebanon, Ky., 6 Cir., 147 F.2d 425; Fleming v. Elliott, 3 Cir., 163 F.2d 215. In Bowles v. Farmers Nat. Bank of Lebanon, Ky., supra [147 F.2d 428], the action was brought to recover treble damages under the Emergency Price Control Act of 1942, § 1 et seq., 50 U.S.C.A.Appendix, § 901 et seq., the provisions of which are strikingly similar to those of the statute authorizing the maintenance of the instant action. In considering the nature of the statute the court among other things said:

"We think that the original enactment of this section clearly provided for a penalty. The basic test whether a law

is penal in the strict and primary sense is whether the wrong sought to be redressed is a wrong to the public or a wrong to the individual. Huntington v. Attrill, 146 U.S. 657, 668, 13 S.Ct. 224, 36 L.Ed. 1123. The purpose of the Emergency Price Control Act of 1942, 50 U.S. C.A.Appendix § 901, is stated as follows: 'It is hereby declared to be in the interest of the national defense and security and necessary to the effective prosecution of the present war, and the purposes of this Act are, to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents; to eliminate and prevent profiteering, hoarding, manipulation, speculation, and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency * * *.'

"This describes a threatened injury to the public. While private rights and interests are necessarily affected, the controlling purpose of the statute is to protect the public during the war emergency.

"Section 205 is headed 'Enforcement.' Under it the Administrator can, at his option, pursue any one of a number of remedies in order to restrain inflation, maintain price levels, and effectuate the purposes of the Act. He may either apply for injunction, § 205(a), cause criminal proceedings to be instituted, § 205(b) and (c), issue licenses in order to regulate dealing in commodities, § 205(f), or file suit for recovery of treble damages, § 205(e). The suit for recovery is plainly intended by Congress to be used as a method of 'enforcement' equally with the other methods prescribed. Hence we conclude that the manifest purpose of § 205 (e) was to prevent the inflationary tendencies sought to be curbed by the Act as a whole, through punishment of violators of the statute by payment of penalties either to the Administrator or to the person injured.

"The amount of such payments, if made to the injured person, supplies a direct and powerful incentive for the enforcement of the Act by the individual. Cf. Gilbert v. Thierry, 1944, D.C.Mass.,

58 F.Supp. 235. As well stated in that case the treble damages provision is intended to be sufficiently attractive to stimulate an aggrieved person to recover his losses and to enforce the law; and it is also intended to be sufficiently burdensome to deter potential violators and to punish actual violators.

"Moreover, if a sum of money is to be recovered by a third person for violation of a statute instead of the person injured, Huntington v. Attrill, supra, 146 U.S. 657, 668, 13 S.Ct. 224, 36 L.Ed. 1123; State of Wisconsin v. Pelican Ins. Co., 127 U.S. 265, 299, 8 S.Ct. 1370, 32 L.Ed. 239, or if the sum exacted is greatly disproportionate to the actual loss, Helwig v. United States, 188 U.S. 605, 611, 23 S.Ct. 427, 47 L.Ed. 614, it constitutes a penalty rather than damages. The fact that the sum is to be recovered in a civil action does not determine the nature of the exaction. Hepner v. United States, 213 U.S. 103, 29 S.Ct. 474, 53 L.Ed. 720, 27 L.R.A.,N.S., 739, 16 Ann.Cas. 960; United States v. Zucker, 161 U.S. 475, 16 S.Ct. 641, 40 L.Ed. 777; Lees v. United States, 150 U.S. 476, 14 S.Ct. 163, 37 L.Ed. 1150; Jacob v. United States, Fed. Cas.No. 7,157.

"In the light of such considerations, the exaction established by this statute clearly falls within the classification of penalty."

In Porter v. Montgomery, 3 Cir., 163 F.2d 211, 215, the court in characterizing the nature of the statute there involved among other things said:

"In the case at bar the sum sought to be recovered by the Administrator clearly is not intended for compensation whereby Montgomery should reimburse or compensate any person whom he injured by sales above ceiling price. The sum sought to be recovered is in the nature of an exaction, to be levied upon Montgomery or his heirs as a penalty to aid in the prevention of a repetition of an offense prohibited by the Act."

The statute being penal in character it must be strictly construed in favor of defendant. Federal Communications Commission v. American Broadcasting

942

Co., 347 U.S. 284, 74 S.Ct. 593. The "interpretations" which we are urged to follow do not comport with this universally accepted rule of construction of a penal statute and hence cannot be accepted by us. It follows that the court should not have granted the government's motion for a directed verdict but should have granted the motion of defendant for a verdict against him for only $258.33.

■ With a few exceptions, in the thirty-four sales under consideration defendant received as part payment of the purchase price a used car. He offered to prove by qualified witnesses that the used cars received by him as part payment did not have the cash value at which they were received. This ruling is urged as error. If we are correct in our conclusion as to the issue already considered this ruling, if erroneous, would probably not be prejudicial. We are, however, earnestly urged by counsel for the respective parties to give the question consideration because of numerous other similar cases now pending or about to be brought and the trial court in excluding this class of testimony suggested that:

"Now there isn't anything to be gained, certainly not by the government,—and probably not for the Ford dealers either, —in trying this case on that theory. It probably ought to be tried on the other theory, that is, excluding that testimony, and then you can get a ruling by a higher Court."

The ultimate question in cases of this character is whether the dealer sold his car for an amount exceeding the ceiling price. In the cases under consideration, as has been observed, the defendant not only received cash but he received a used car. To determine whether the amount of the consideration exceeded the ceiling price required an evaluation of the used car. It was, we think, important to determine not what the defendant ultimately received for the used car but what the reasonable cash value of the used car was at the time of the transaction. This fact was certainly capable of proof by testimony of qualified witnesses. We do not mean to be understood as saying that proof as to the reasonable cash value of the car at the time of the transaction would necessarily be conclusive but it was competent evidence going to the amount of the consideration actually received by the dealer.

■ The judgment appealed from is therefore reversed and as the defendant failed in the trial court to move for judgment notwithstanding the verdict, as provided by Rule 50(b), Federal Rules of Civil Procedure, 28 U.S.C.A., the cause is remanded to the trial court with directions to grant a new trial.