Harold AMES, Plaintiff-Appellant,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. and Christopher V. Streit, Defendants-Appellees.

No. 92, Docket 77–7192.

United States Court of Appeals,
Second Circuit.

Argued Oct. 6, 1977.

Decided Dec. 6, 1977.

Barry H. Singer, New York City (Lowenthal, Landau, Fischer & Singer, P.C., New York City, of counsel), for plaintiff-appellant.

James J. Dolan, New York City, for defendants-appellees.

Before KAUFMAN, Chief Judge, and GURFEIN and MESKILL, Circuit Judges.

GURFEIN, Circuit Judge:

Plaintiff, Harold Ames, appeals from an order of the district court, Haight, J., staying the trial of this action against Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") and Christopher V. Streit, and compelling arbitration. Plaintiff is seeking money damages for alleged violations of the Commodity Exchange Act, as amended by the Commodity Futures Trading Commission Act of 1974, 7 U.S.C. §§ 6b and 6c, and regulations thereunder, basing jurisdiction on 7 U.S.C. § 2 et seq.[1]

Ames opened his account with Merrill Lynch on November 26, 1975, when he signed a standard form customer's agreement that Merrill Lynch required all of its customers to sign. It provided, inter alia, that any controversy between Ames and Merrill Lynch should be submitted to arbitration under the rules of the New York Stock Exchange. The complaint alleges that some time after January 1976 the defendant deviated from an agreed commodities program primarily for the purpose of generating commissions through excessive trading. Plaintiff further alleges that he received false and misleading reports which the defendants knew were false and that despite their statements, defendants were trading in a manner not allowed by their agreement with the plaintiff. On this appeal, we are not called upon to decide whether the complaint states a claim for relief. It is agreed that there is an implied cause of action under the Act for a private remedy.

This action was commenced on July 13, 1976. The motion to dismiss the complaint for lack of subject matter jurisdiction, F.R. Civ.P. 8(a)(1) and 12(b)(1), or alternatively, to stay the action pending arbitration, 9 U.S.C. § 3, was filed by the defendant on September 3, 1976, and the decision and order of the district court was filed on March 21, 1977.

The plaintiff opposed a stay of arbitration on the ground that the new regulations of the Commodity Futures Trading Commission ("Commission"), 17 C.F.R. Part 180, which became effective on November 29, 1976, after the agreement was executed, were retroactive in their operation and rendered the agreement to arbitrate null and void; and, alternatively, that under the doctrine of *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), the protection of investors under the Act required the nullification of compulsory arbitration of future disputes in a brokerage account agreement.

 The district court found that subject matter jurisdiction existed under 28 U.S.C. § 1331(a) or as part of the interstate commerce jurisdiction under 28 U.S.C. § 1337. In reaching its decision to order arbitration, the district court rejected, however, both arguments made by the plaintiff in support of his position that the agreement to arbitrate was void and unenforcible. Judge Haight, in a thoughtful opinion, conceded that 17 C.F.R. § 180.3, in force at the time of his decision, would render the agreement to arbitrate a nullity.[2] He agreed with the plaintiff that the Commission intended that

---

1. Because of the numerous amendments to the Commodity Exchange Act since its enactment in 1922, we will refer to the original Act and its amendments collectively as "the Act," and will simply refer to the present codification in 7 U.S.C. §§ 1–18.

2. Section 180.3(b) of 17 C.F.R., promulgated by the Commission, allows enforcement of arbitration agreements only when certain conditions are met. These include: 1) that signing the agreement not be made a condition of access to the market; 2) that the customer sign separately the clause providing for arbitration; and 3) that there be a warning in bold-face type that the customer is giving up certain rights to assert his claim in court. These conditions were, concededly, not met in this case.

§ 180.3 be given retroactive effect.[3] He also recognized that a retroactive application of § 180.3 would make it impossible for the defendants to seek arbitration of the instant claims even if the provision to arbitrate might have been entered into voluntarily. He held, however, that the application of § 180.3 "to antedated Customer Agreements could lead to unfairness and inequities not intended by the drafters of the Commodities Exchange Act." He further held, accordingly, "that retrospective application of § 180.3 would serve to prejudice heretofore valid agreements entered into on the basis of existing legal authority." The judge also refused to accept the contention that *Wilko v. Swan, supra,* required nullification of the arbitration agreement.

■ A court must apply the law as it exists at the time of its decision, even where the law has changed during the pendency of the action, unless the statute or legislative history reveals an intention of prospective application only, or retroactive application would lead to "manifest injustice." *Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). In applying this principle to the instant case, we are called upon to determine (1) whether the Commission had the authority to apply the provisions of § 180.3

to all arbitration agreements; (2) whether the Commission intended the application of the regulation to arbitration agreements antedating the regulation and (3) whether, given the authority and intention to make the regulation effective as to antedated agreements, the particular circumstance that the *dispute* arose before the effective date of the regulation nevertheless precludes its application.

■ The Act, in dealing with the arbitration of customers' disputes, requires only that each contract market provide a "fair and equitable procedure through arbitration or otherwise" for settlement of customers' claims up to $15,000. 7 U.S.C. § 7a(11). The same section provides that "the use of such procedure by a customer shall be voluntary." The Act mentions neither arbitration of claims over $15,000 nor arbitration outside of the contract market.

The Commission determined that to accomplish the purpose of the Act, arbitrations that do not fall within the literal scope of § 7a(11) should also be regulated, even in the absence of a specific statutory source. 40 Fed.Reg. 54,430 (Nov. 24, 1975); 41 Fed. Reg. 42,945–47 (Sept. 29, 1976). The Act gives the Commission authority "to make and promulgate such rules and regulations as, in the judgment of the Commission, are

---

**3.** The Commission filed a brief *amicus curiae* in which it argues that the district court was wrong in holding that § 180.3 should not be applied to disputes arising after the date of the regulation under existing agreements, but that it was probably right in not applying the regulation to disputes antedating the regulation, as in this case. We recognize that the Commission staff thought it easier to argue in favor of retroactive application of the regulation to preexisting contracts if they surrendered the claim to retroactive application to preexisting disputes. We do not share their concern. In any event, an *amicus curiae* is no more a witness than any other advocate. The Commission cites no administrative precedent, nor does it suggest that there has been any practical construction by the Commission which it could urge us to accept on the ground that the Commission has, in the past, so "interpreted" the regulation. We cannot accept the Commission's current litigating position as an "interpretation" by the Commission, which the dissenting opinion calls it. *See Davies Warehouse*

*Co. v. Bowles,* 321 U.S. 144, 156, 64 S.Ct. 474, 481, 88 L.Ed. 635 (1944) (administrative ruling challenged immediately upon issuance had not "seasoned or broadened into a settled administrative practice" to which the court should defer); *Massy v. United States,* 214 F.2d 935, 940 (8th Cir. 1954) ("interpretations" of regulation issued after regulation ceased to be in effect, and after the action was being tried, and never published in the Federal Register, entitled to no more weight nor persuasiveness than the argument of counsel appearing in the case); and *Fleming v. Van Der Loo,* 160 F.2d 906, 912 (D.C. Cir. 1947) (no particular weight to be given to an administrative interpretation of a regulation "made after [the] controversy had arisen"); but *compare Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 417–18, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945) cited by the dissent (Bulletin issued *contemporaneously* with regulation and First Quarterly Report to Congress accorded considerable weight in interpreting the regulation).

reasonably necessary to effectuate any of the provisions or to accomplish *any of the purposes of this Act.*" 7 U.S.C. § 12a(5). (emphasis added). The Commission acted under this general rulemaking authority when it promulgated § 180.3. 40 Fed.Reg. 54,432–33 (Nov. 24, 1976). There is no challenge to its power to make such a rule under its general rulemaking powers.

The Commission's intention regarding the retroactivity of the regulation can only be ascertained by examining the administrative history of the rule. Shortly after its creation, in 1975, the Commission undertook an examination of the use of arbitration in the futures industry. It learned that arbitration was frequently conducted not under the auspices of the contract markets regulated by the Commission but through arbitration sponsored by the New York Stock Exchange or other securities-oriented organizations. It also became apparent that in many cases arbitration was not undertaken voluntarily by customers, but that customers were compelled to agree to pre-dispute arbitration clauses as a precondition to doing business. Indeed, this practice was found to be so prevalent that a customer might effectively be frozen out of the futures market if he refused to execute a predispute agreement. 41 Fed.Reg. 27,526 (July 2, 1976); 41 Fed.Reg. 42,945 (Sept. 29, 1976).

Initially, the Commission proposed to bar any agreement to arbitrate future disputes. 40 Fed.Reg. 34,152 (Aug. 14, 1975).[4] But it provided that the absolute bar should not apply to claims or grievances arising out of transactions occurring prior to the adoption of the regulation and for one year thereafter, if such transactions were subject to agreements actually entered into before the adoption of the regulation. 40 Fed.Reg. 54,430, 54,435 (Nov. 24, 1975).

The Commission received written comments and took oral testimony on March 5, 1976. At this hearing conducted by the Commission, representatives both of Merrill Lynch and Shearson Hayden Stone conceded that a customer could not do futures business with the firm if he refused to sign a predispute arbitration agreement. Commodity Futures Trading Comm'n, *Oral Hearing on Arbitration and Other Dispute Settlement Procedures* 32–34, 37, 82–98. (March 5, 1976); see generally 41 Fed.Reg. 42,945 (Sept. 29, 1976).

After the hearings and comments, the Commission modified its previous proposal to bar arbitration of future disputes entirely. Instead, the Commission now proposed to permit the continued use of pre-dispute arbitration agreements, but only under conditions designed to insure that arbitration was truly voluntary on the part of the customer. 42 Fed.Reg. 27,526–28 (July 2, 1976).

With the withdrawal of the proposal to bar arbitration *entirely*, the Commission also withdrew the exemption for disputes arising before or within one year after the adoption of the regulation under arbitration agreements antedating the regulation. Instead, the thrust was to include even preexisting arbitration agreements in the new order of things. Thus, the Commission announced on July 2, 1976, that "on the effective date, all compulsory arbitration agreements which do not comply with the amended proposed rule § 180.3 will be null and void, including those heretofore signed by customers." 41 Fed.Reg. 27,527–28. At the same time, it deleted from the proposed rule the saving clause for agreements and disputes antedating the regulation.

On September 29, 1976, the amended proposed rule was adopted to become effective on November 29, 1976. 41 Fed.Reg. 42,942–47 (Sept. 29, 1976). At that time, the Commission reiterated its position that "on the effective date of proposed § 180.3(b), all pre-dispute arbitration agreements that do not satisfy the conditions set forth in the proposed rule will be null and void, including those heretofore signed by customers." 41 Fed.Reg. 42,944 (Sept. 29, 1976). Again,

---

4. The rule was originally proposed as 17 C.F.R. § 200.3(c), and later redesignated 17 C.F.R. § 180.3(b).

there is no mention of any exemption for disputes already in being. Indeed, any such exemption would hardly conform to the notion, stated by the Commission itself, that customers who had entered into agreements before adoption of the regulation needed and were entitled to the protections of the rule no less than those customers who signed agreements after November 29, 1976. 41 Fed.Reg. 42,944 n. 18 (Sept. 29, 1976). After reviewing the administrative history of the rule, and with due respect for the current litigating position of the Commission on this question, we conclude that § 180.3 fairly read should apply to all arbitration agreements existing at the effective date of the regulation.

The Commission, in finally adopting the rule, considered and rejected the legal contention raised by some commentators that the abrogation of existing arbitration agreements which do not comply with proposed § 180.3(b) would violate due process and would be unconstitutional under the obligation of contracts clause and as an *ex post facto* law. The constitutional issue, though necessarily treated in rather summary fashion by the Commission, was treated correctly. Though we note that Merrill Lynch has limited its argument on this appeal to the contention that § 180.3 should not be interpreted to apply retroactively to preexisting agreements or disputes, a contention which we have already disposed of, we also note that the constitutional issue has been suggested by the holding of the district court that retroactive application of the regulation to preexisting arbitration agreements would result in "unfairness and inequities". We therefore conclude this opinion with a brief discussion of the constitutional questions which might be considered in that regard.

The obligation of contracts clause does not, of course, apply to the federal government, *Sinking Fund Cases*, 99 U.S. 718, 25 L.Ed. 496 (1878), nor is the *ex post facto* law provision of the Constitution applicable

to other than criminal statutes. *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798); *Galvan v. Press*, 347 U.S. 522, 531, 74 S.Ct. 737, 98 L.Ed. 911 (1954); *Harisiades v. Shaughnessy*, 342 U.S. 580, 594–95, 72 S.Ct. 512, 96 L.Ed. 586 (1952). This leaves for consideration the due process inquiry into the fairness of retroactive application of the regulation in this case—or, as the Court put it in *Bradley v. Richmond School Board, supra*, whether retroactive application would result in "manifest injustice".

First, the argument that the regulation should not apply to preexisting disputes assumes that the arbitration agreement in question was a valid agreement before the regulation became effective. Based on the Commission's finding, *supra*, it may be assumed that if Ames had refused to sign the contract, he would have been excluded from the futures market and that requiring him to sign a contract of adhesion in such circumstances made his signing less than voluntary. We have no doubt that the Act itself, enacted as it was for the protection of investors, prohibited a surrender of private remedies through an agreement to arbitrate which was not voluntary in the sense that the penalty for refusal was exclusion from the market.[5] The freedom to contract is often diminished when an industry is under governmental regulation, *F.H.A. v. Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958), and the commodities futures industry is such a regulated industry.

Moreover, the Commission's position depends upon a distinction which appears to us to be of no consequence. Even if arbitration were to be considered a substantive right rather than a procedural remedy, we would perceive *no ready distinction* between a case in which the arbitration agreement antedated the regulation but the dispute did not, and one in which both the agreement and the dispute antedated the regulation. In *either* case, the frustration of the intent of the parties is so unfair as to

---

5. The Commission itself has consistently maintained this position. *See* 40 Fed.Reg. 29,122 (July 10, 1975) (Interpretative Response to Question 4); and 41 Fed.Reg. 42,944–45 (Sept. 29, 1976). The Commission has reiterated this position in its *amicus curiae* brief in this case.

constitute a violation of due process, or it is not. If, on the other hand, resort to arbitration is deemed a matter of remedy, the broker suffers no greater harm from refusal to enforce the arbitration agreement when the dispute had already arisen (as in this case) than when the dispute arose after the effective date of the regulation. In either case, no irreparable harm has been done by a change in the available remedy. Nor has there been any change of position to the detriment of the broker and certainly no manifest injustice. With due respect for the present litigating posture of the Commission, we see no reason to distinguish between cases in which the dispute had already arisen and cases in which the dispute occurs after the effective date of the regulation.

 Finally, the Commission's position depends upon an exaggerated estimate of the constitutional protections afforded to the particular contract right to arbitrate. Congress had the power under the Commerce Clause to enact the Act and to declare its purposes. Generally speaking, "[i]mmunity from federal regulation is not gained through forehanded contracts". *Fleming v. Rhodes*, 331 U.S. 100, 107, 67 S.Ct. 1140, 1144, 91 L.Ed. 1368 (1947). "[T]he reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order." *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 435, 54 S.Ct. 231, 239, 78 L.Ed. 413 (1934). When the right claimed to have been abrogated unfairly is merely a con-

tractual right to a remedy we have no doubt that Congress has power to foreclose the remedy if it lets stand an adequate remedy in its place. *Cf. Hardware Dealers Ins. Co. v. Glidden Co.*, 284 U.S. 151, 159, 52 S.Ct. 69, 76 L.Ed. 214 (1931); *Crane v. Hahlo*, 258 U.S. 142, 42 S.Ct. 214, 66 L.Ed. 514 (1928). As the Court said in *Hahlo*, 258 U.S. at 147, 42 S.Ct. at 216, "No one has a vested right in any given mode of procedure (*Railroad Co. v. Grant*, 98 U.S. 398, 401, 25 L.Ed. 231; *Gwin v. United States*, 184 U.S. 669, 674, 22 S.Ct. 526, 46 L.Ed. 741) and so long as a substantial and efficient remedy remains or is provided due process of law is not denied by a legislative change. *Oshkosh Waterworks Co. v. Oshkosh*, 187 U.S. 437, 439, 23 S.Ct. 234, 47 L.Ed. 249." See also *Montana Power Co. v. Federal Power Comm'n*, 445 F.2d 739, 747–48 (D.C. Cir. 1970).

Arbitration is a form of procedure, not of substantive law. As Judge Cardozo expressed it:

"Arbitration is a form of procedure whereby differences may be settled. It is not a definition of the rights and wrongs out of which the differences grow. This statute did not attach a new obligation to sales already made. It vindicated by a new method the obligation then existing."

*Berkovitz v. Arbib & Houlberg, Inc., supra*, 230 N.Y. at 270, 130 N.E. at 290.[6]

 The power of Congress to abrogate an arbitration procedure previously

---

**6.** We recognize that there are instances in which the application of a law or regulation which alters available remedies to a case in which the dispute had already arisen could be so unfair and inequitable as to be unconstitutional. But identification of such instances depends upon attention to the stage to which the *litigation* has progressed and not merely to the fact that the dispute had arisen before the change in the law. Judge Cardozo made this point in *Berkovitz v. Arbib & Houlberg*, 230 N.Y. 261, 130 N.E. 288 (1921), where, in both cases consolidated for appeal, the arbitration agreements antedated the state's Arbitration Law, which for the first time allowed enforcement of arbitration agreements. One of the suits was instituted after the change in the law, and the arbitration agreement was enforced under the Arbitration Law. The second case

had been instituted four years before enactment of the Arbitration Law; there had been extensive litigation before the defendant moved, on the eve of trial and just after enactment of the new law, for a stay of proceedings to allow arbitration. In considering the applicability of a change in the law to cases already pending at the time of the change, Judge Cardozo drew an important distinction. "The change is applicable even [where the case is pending at the time of the change] if directed to the litigation in future steps and stages [citation omitted]. It is inapplicable, unless in exceptional conditions, where the effect is to reach backward, and nullify by relation the things already done [citations omitted]." *Id.* at 270, 130 N.E. at 290. Judge Cardozo, noting that "years of costly litigation" would be "rendered futile" by application of the Arbitration

contracted for has been upheld. *Montana Power Company, supra.* The same result should follow where the procedure is affected by an administrative regulation within the scope of its delegated authority.[7]

We do not reach the applicability of the rigidly exclusive rule of *Wilko v. Swan, supra,* because here the regulatory agency itself sanctions arbitration as a means for the settlement of disputes and does not find the process itself antithetical to the purposes of the Act.[8] We do rely to some extent on the spirit of *Wilko* to sustain the authority of the Commission to restrict the conditions under which the customer, as a protected investor, surrenders his right to sue in a court.

The order compelling arbitration and staying the action is reversed.

MESKILL, Circuit Judge (dissenting):

I respectfully dissent. The arbitration clause involved in this case was valid when the parties executed the account agreement;[1] it was valid when Ames' claims arose; and it was still valid when Ames commenced the instant action.

Although federal law generally, and the Commodity Act in particular, favors the arbitration of disputes, all are agreed that 17 C.F.R. § 180.3 would bar enforcement of this arbitration clause if it were entered into today. It is also clear that the Commission intended § 180.3 to apply retroactively to at least some agreements entered into prior to the regulation's effective date. Obviously, it did not wish to postpone the effectiveness of the regulation until the expiration of all pre-existing agreements. In its brief as *amicus curiae,* the Commission explains that its intent to reach pre-existing agreements did not extend to cases where a dispute had already arisen at the time the regulation was adopted. The Commission's use of the dispute as a focal point is not based on an inconsequential distinction. Before this dispute arose, the right conferred by the arbitration clause was inchoate. The value of the right was remote and speculative. It took on real meaning, however, when an actual dispute arose, for it provided an inexpensive and expeditious means of resolving that dispute. There would have been nothing particularly unjust about invalidating this arbitration clause had no dispute arisen, because the parties could have altered their relationship accordingly; indeed, they might even have entered into a new, valid arbitration agreement. After the dispute arose, however, the unfairness of taking away the right to arbitrate is striking.

The Commission's interpretation is fair and reasonable. It gives a retroactive effect to the regulation to the extent necessary to bring about an immediate change in

Law to the second of the consolidated cases, held the new law inapplicable to it. In the case at bar, in contrast, only the complaint and answer, and a motion to dismiss or to compel arbitration had been filed before the new regulation became effective. The district court had not yet decided the motion on the effective date. In Cardozo's terms, the new regulation affected what was still a "future step" in the litigation. We see no unfairness in applying the new regulation at this early stage of the litigation, when no substantial costs have yet been incurred, and no important interlocutory rulings have been made, save for the stay itself.

7. It is, of course, a truism, as the dissenting opinion notes, that we should try to construe a regulation so as to avoid a constitutional issue. But *that does not mean that if the history of the regulation points a particular way we should simply expunge the result we have reached because we shrink from facing a constitutional issue.* A litigant is entitled to an honest reading of the regulation. Avoidance of the constitutional issue may be likened to the proverbial cart; the fair reading of the regulation to the proverbial horse.

8. In *Wilko v. Swan, supra,* the Court held that an arbitration agreement between a brokerage firm and one of its customers would not be enforced when the customer sought a judicial trial of his claims under the Securities Act of 1933.

1. The majority's suggestion that the arbitration clause might not have been valid is groundless. No duress was involved, and even if this were a contract of adhesion the arbitration clause would be denied effect only to the extent necessary to prevent an unfair result. *See* J. Calamari & J. Perillo, The Law of Contracts § 3 (1970). There is certainly nothing unfair about the enforcement of this arbitration clause.

existing contracts without unnecessarily cutting off accrued rights. For this reason, I would adopt it.

In addition, the decision of the majority violates no less than three basic canons of construction—canons we cannot ignore. First, the Commission's interpretation of its own regulation must be given "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). In my view, the majority, instead of trying to accommodate the Commission's interpretation, goes to great lengths to evade it,[2] without ever showing that "it is plainly erroneous or inconsistent with the regulation." Second, we should construe new regulations in such a way as to avoid interference with antecedent rights. *Greene v. United States*, 376 U.S. 149, 160, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964). The question

---

**2.** In order to avoid giving "controlling weight" to the Commission's view, the majority characterizes it as a mere "current litigating position" and denies that it should be afforded the deference due to an "interpretation." It is a mistake to approach this issue as if the only question were whether the Commission's view constitutes an "interpretation." The views of an administrative agency are never controlling in the sense that they have the force of law; rather they

> constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). The issue, therefore, is not whether the judgment constitutes an "interpretation," but whether it is thorough, rational and consistent with other pronouncements. If it is, then it is entitled to "controlling weight" regardless of whether it is denominated an "interpretation."

In applying these standards to the instant case, I should note at the outset that I can perceive no reason why the views of an administrative agency should be given either more or less deference depending on where they are expressed. An *amicus* brief is as good a place as any. *See, e. g., Skidmore v. Swift & Co., supra*, where the Court relied on "rulings, interpretations and opinions," including "the conclusion of the Administrator, as expressed in the brief amicus curiae." 323 U.S. 139–40, 65 S.Ct. at 164. The majority refers to the Commission's "current litigating position" as if to suggest that the Commission is not serious about it or has taken it merely for reasons of expediency. A reading of the Commission's argument belies that suggestion and demonstrates that the Commission views the submission of this *amicus* brief as a serious undertaking.

> When a substantive provision of law is applied prospectively, *i. e.*, affects only conduct and events arising after its effective date, due process considerations—questions of fairness—are unlikely to arise, since conduct can be adjusted prospectively to comply with the new requirements. Retrospective application of a statute or rule can, however, raise due process considerations, although the mere fact or [sic] retroactivity does not, standing alone, make it unconstitutional. . . . Absent a strong showing of contrary intent, the courts have generally construed substantive legislation and rules to apply prospectively only. . . .
>
> While the Commission, in the adoption of Rule 180.3(b), has provided that all arbitration clauses not complying with the provisions of Rule 180.3(b) would be null-and-void as of November 29, 1976, *the requirements of the rule . . . were intended to be effective only concerning disputes that had not arisen prior to that date. . . . Thus, the only element of unfairness that might otherwise have arguably been involved in the enforcement of the Commission's rule was eliminated.*
>
> Insofar as the Commission's rule applies prospectively to govern the resolution of all disputes arising after its effective date, firms were given two months after the adoption of Rule 180.3(b), as a reasonable period in which to bring their agreements into conformity with the rule's specific requirements. Thereafter, disputes which subsequently arose would be encompassed by the protections of Rule 180.3(b) and this was to be true regardless of any prior agreements to the contrary.

Memorandum of the Commodity Futures Trading Commission, *Amicus Curiae*, at 12–13 (footnotes and citations omitted; emphasis added). These views are thorough, rational and persuasive. Because the Commission has expressed no other views on the precise issue before us, there is no inconsistency with any earlier or later pronouncements. Thus, absent some showing that the Commission's interpretation was "plainly erroneous or inconsistent with the regulation," I believe we should give it controlling weight.

before us is not *whether* the regulation is retroactive, but *to what degree.* By following the Commission's interpretation, I would construe the regulation in a way that would least interfere with antecedent rights. The majority needlessly opts for the path of greatest interference. Third, a regulation should be construed, whenever possible, so as to avoid constitutional issues. *See Ashwander v. T.V.A.,* 297 U.S. 288, 348, 56 S.Ct. 145, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *United States v. Oates,* 560 F.2d 45, 80 (2d Cir. 1977); *Fine v. City of New York,* 529 F.2d 70, 76 (2d Cir. 1975). The majority goes out of its way to interpret the regulation in a manner that necessitates the resolution of a difficult due process issue.[3]

I dissent.

---

**3.** The majority finds it unnecessary to reach the question whether *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), renders the arbitration clause invalid. My analysis requires me to reach the issue. I do not consider *Wilko* controlling. In that case, the Supreme Court held that arbitration clauses in margin agreements are void under a provision of the Securities Act of 1933 which prohibits "[a]ny condition, stipulation, or provision binding any person . . . to waive compliance with any provision" of the Act. The Court said that the arbitration clause was a "stipulation" that required a customer to "waive compliance with" the "provision" in the Act for a private damage action. 346 U.S. at 434–35, 74 S.Ct. 182. *Wil-*

*ko* has been applied in other situations where a waiver of a statutory cause of action would undermine a paramount federal policy. *E. g., Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (Title VII cause of action cannot be waived by arbitration clause in collective bargaining agreement). The Commodity Act has no express provision for a private damage cause of action and no non-waiver clause. Thus, *Wilko* is inapplicable. If some paramount federal policy required that there be a non-waivable private cause of action under the Commodity Act, surely we would not be required to imply the existence of the cause of action itself.