The CITY OF NEW YORK, Plaintiff,

v.

RAPGAL ASSOCIATES, the St. Nicholas Manor Associates, and Norman Rappaport Defendants.

No. 84 Civ. 7526 (JMW).

United States District Court, S.D. New York.

Dec. 23, 1986.

New York City Law Dept. by Alexandra S. Bowie, Michael D. Young, for plaintiff.

Gilbert Wallach by Steven Rosen, New York City, for defendants.

WALKER, District Judge:

## INTRODUCTION

The City of New York commenced this action to compel defendants Rapgal Associates, The St. Nicholas Manor Associates and Norman Rappaport to donate $156,211 to a community organization. The defendants are real estate developers who participated in the federally funded and locally administered Neighborhood Strategy Area program ("NSA program") for the Hamilton Heights area of Manhattan. Six months after the defendants entered the NSA program, the City promulgated a regulation requiring participating developers to contribute a specified portion of their profits to a local community organization. The defendants have refused to obey the regulation claiming that it does not apply to them. The City, in turn, has denied defendants the opportunity to participate in further local housing development projects. The defendants have counterclaimed against the City, alleging that this denial violates the defendants' rights as a matter of tort, contract, and constitutional law.

The City has moved for summary judgment on its claims, pursuant to Fed.R. Civ.P. 56, and to dismiss defendants' coun-

terclaim under Fed.R.Civ.P. 12 on the grounds that the defendants, first, have failed to state a claim upon which relief can be granted and, second, did not notify the City of their claim within the time required by local law.

The parties do not dispute the material facts which gave rise to this case, although they hotly contest the legal conclusions to be drawn from the facts. The defendants oppose the motion for summary judgment by arguing that, under their reading of the law, there are additional factual issues which require a trial on the merits.

### FACTS

I. *The NSA Program*

The case involves the City's administration of the NSA program, designed by the United States Department of Housing and Urban Development ("HUD") to coordinate local housing and development planning with federal funding for low income housing. Under the program, the local government requests HUD to designate a discrete area a Neighborhood Strategy Area ("NSA"). Once HUD does so, the local government may solicit and screen proposals for Section 8 housing submitted by private developers.[1] The City, thus, has the means to ensure that Section 8 housing projects are consistent with its local development plans and associated codes, regulations and orders. Once the City determines that a project is in accord with its plans and appears to meet the federal Section 8 program requirements, the City forwards the proposal to HUD for approval. After HUD approval is obtained, the developer becomes eligible for a federally subsidized and guaranteed mortgage and local real estate tax abatements.

II. *The Events*

In May 1978, the City of New York applied to HUD for NSA designation of the Hamilton Heights section of Manhattan.

After a conditional approval of the City's application in September 1978, HUD granted final approval for Hamilton Heights in September 1979. On May 21, 1979, during the interim between conditional and final approval, the City's Department of Housing Preservation and Development ("HPD"), charged with administering the NSA program, published a "Request for Housing Proposals" to solicit plans from prospective Section 8 developers. The published notice specified a requirement that every developer under the NSA program enter an agreement with a local community organization to donate some amount of the profits from the real estate venture to the organization. The notice also stated that both the organization chosen to receive the funds and the form of the agreement were subject to HPD approval.

On May 23, 1979, the defendants submitted an NSA program proposal to develop "St. Nicholas Manor" in the Hamilton Heights area of Manhattan. Before submitting the proposal the defendants reached an agreement to donate $50,000 to the Hudson Piers Redevelopment Counsel, a local community group, should HPD and HUD approve the St. Nicholas Manor project. The defendants submitted to HPD a detailed analysis of their estimated costs for the project, predicated on their donation of $50,000 to the Hudson Piers Redevelopment Council. By letter dated September 12, 1979, HPD approved the defendants' proposal to develop St. Nicholas Manor and enclosed therewith that portion of the previously published "Request for Housing Proposals" referring to donations to community organizations. The letter stated that the defendants must tender an agreement with a qualified community organization to HPD within six weeks of the date of the letter. HUD granted federal approval for the project on September 21, 1979.

On November 28, 1979 the defendants forwarded to HPD a written contract with

---

**1.** Under the Section 8 housing program, established in 42 U.S.C. §§ 1437–1440 and 12 U.S.C. § 1715z–1, the federal government allots rent subsidies to qualified low income families in order to help them procure safe, sanitary, comfortable and affordable homes. The federal government then pays the landlord the excess between 30 percent of the tenant's income and the fair rental value of the apartment.

the Hudson Piers Redevelopment Council that obligated the defendants to pay $50,-000 to the group over a five year period. HPD never formally approved the contract nor conveyed any approval to defendants. However, an internal memorandum, dated April 22, 1980, states that the Hudson Piers Redevelopment Council "appeared" to have an agreement that met the City's standards.

On May 7, 1980, HPD issued a complex set of regulations to implement its goal of returning some portion of the developers' profits back to the community. These regulations detailed the method for computing the minimum amount of money each developer must agree to contribute to a community organization, established guidelines for use of the money by the groups, and explained HPD's role in overseeing the agreements.

By letter dated May 7, 1980, HPD informed each developer of these regulations. The regulations, which the City enclosed with the letter, stated that in order to avoid delaying review and approval of Section 8 housing proposals, HPD would establish escrow accounts for developer contributions if no agreement between a developer and a qualified community organization had been reached or if a signed agreement was subsequently disapproved by the City. With the funds in escrow, the City would allow the project to proceed. The money could be released from escrow pursuant to an acceptable agreement. While the City had the right to refuse to close on the final mortgage if an agreement was not reached it could also, at its option, direct the use of the escrowed funds for certain general community works in the particular NSA. The regulations established percentage guidelines for community organization donations and the letter explained that, "the guidelines for minimum payments to community groups are designed to set a standard below which agreements will not be acceptable. However, any agreement that *exceeds* our minimum guidelines will remain in force."

On July 9, 1980 following inquiries by perplexed developers who were unable to understand the system for computing the minimum payments, HPD amended these regulations. Under the amended regulations, the minimum contribution was an amount equal to at least 2.75 per cent of the low interest mortgage on the project. The letter reiterated that agreements previously approved by HPD for amounts in excess of 2.75 per cent of the developer's mortgage would remain in effect.

The defendants' agreement with Hudson Piers Redevelopment Council for a contribution of $50,000 indisputably did not meet the requirement that developers donate 2.75 per cent of their mortgage. However, after receipt of the May and July letters explaining these regulations, the defendants made no effort to renegotiate their agreement with the Hudson Piers Redevelopment Council or to request that the City approve the agreement as an exception to the regulation.

On December 1, 1980 HPD sent another letter to all developers again setting forth the donation requirements for the NSA program. For the purposes of this summary judgment motion the Court accepts the defendants' claim that they never received this letter and, therefore, at the time knew nothing of its contents.

On July 2, 1981, the initial mortgage closing for the project took place. The City participated in the closing without mentioning the donation requirements or any breach of them by the defendants. During the period between the City's September 12, 1979 approval of defendants' proposal and this closing, defendants expended approximately $60,000 in preparation for the project.

On December 10, 1981, five months after the closing, HPD notified the defendants that they had not complied with the donation regulation and demanded that they reach an agreement for payment of at least $156,211 to a community group, or deposit this sum of money in an HPD-controlled escrow account. Thereupon, for the first time, defendants attempted unsuccessfully to convince HPD to change its position. On January 28, 1982, Norman Rappaport's request that HPD approve the 1979 agree-

ment was refused. The defendants then asked HPD to waive the 2.75 per cent donation requirement as to them. On January 28, 1983 HPD denied this request, insisted that the defendants comply with the regulation by February 15, 1983, and added that a failure to do so would jeopardize future projects that the defendants might wish to perform under a City program. In April 1983, after defendants refused to submit an agreement, the City notified them that they would not be considered for any further development projects until they complied with the regulation. The defendants completed the St. Nicholas Manor project and, on January 26, 1984, participated in the final mortgage closing. To date, the defendants have made no payment to the Hudson Piers Redevelopment Council, to any other community group or into an escrow account.

### STATUS OF THE CASE

The City seeks summary judgment in its favor directing defendants to donate $156,211 to a community organization approved by the City and dismissing defendants' counter claim. For the reasons set forth, summary judgment in favor of the City is granted.

### SUMMARY JUDGMENT STANDARD

Under Fed.R.Civ.P. Rule 56, summary judgment is appropriate when "there is no genuine issue as to any material fact" and as a matter of law the moving party is entitled to judgment. Recently both the Supreme Court and the Second Circuit Court of Appeals have pronounced that summary judgment is "not a disfavored procedural shortcut," but rather is one mechanism by which the court can resolve disputes speedily, justly and economically. *Celotex Corporation v. Catrett,* — U.S. —, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). *See also, Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9 (2d Cir.1986). To withstand a motion for summary judgment *material* facts must be in *genuine* dispute. Mere speculation or conclusory assertions in pleadings or affidavits do not raise triable issues of fact.

### DISCUSSION

The defendants attempt to cast their dispute with the City as one in contract. First, they assert that a contract was formed when they responded to the City's May 1979 published notice entitled "Request for Housing Proposals" with their plan to develop the St. Nicholas Manor and the City on September 12, 1979 authorized the project. This "contract" is said by them to contain only the requirements set forth in the published notice that, it is not disputed, set forth no minimum donation requirement. Second, defendants assert that by subjecting them to regulations promulgated on May 7, 1980 and amended on July 9, 1979, the City is depriving them of the expectation of their bargain, namely, no minimum donation without due process.

The Court agrees with the City, however, that the dealings between the parties prior to May 1980 created no contract between them. These dealings were merely those between a developer and the local administrator of a program for dispensing federal housing benefits. There is no evidence of any bargained-for exchange or relinquishment of consideration for benefits received. By approving the defendants' proposal the City entered no contract, but rather certified to HUD that their project furthered the City's development objectives.

A similar situation arose in *American Hospital Association v. Schweiker,* 721 F.2d 170 (7th Cir.1983). There the American Hospital Association ("AHA") sued the United States Department of Health Education and Welfare ("HEW"), claiming that certain regulations, imposing obligations on all hospitals receiving federal aid under Titles VI and XVI of the Public Health Service Act, 42 U.S.C. §§ 291, 300*o* et seq., violated the contractual rights of the hospitals who had entered the program many years before HEW issued the regulations. In rejecting AHA's claim that, by participating in the program, its hospitals had entered into a contractual relationship with the government that could not be altered by "retroactive regulations" the Seventh Circuit Court of Appeals stated:

The relationship between the government and the hospitals here cannot be wholly captured by the term "contract" and the analysis traditionally associated with that term. Rather than a voluntary agreement negotiated between two parties, a grant-in-aid program like that under the Hill-Burton Act is an exercise by the federal government of its authority under the spending power to bring about certain public policy goals. The government acts by inducing a state or private party to cooperate with the federal policy by conditioning receipt of federal aid upon compliance by the recipient with federal statutory and administrative directions.

*American Hospital Association,* 721 F.2d at 182–83.

In the instant case, the Court need not conclude that contractual rights may *never* be conferred in a regulatory setting; only that none were conferred here, where there is no showing that the City intended to be contractually bound or that the City acted in any way other than in its role as an administrator in control of a government spending program designed for local benefit.[2]

■ Even if some contract could be found here based upon defendant's proposal, HPD was entitled to promulgate or amend subsequent regulations that altered legitimate expectations of the defendants in furtherance of the federal-local spending program it was charged with administering. For instance, in *Ames v. Merrill Lynch, Pierce, Fenner and Smith,* 567 F.2d 1174, 1179 (2d Cir.1977), the Second Circuit held a regulation by the Commodity Futures Trading Commission voiding, certain arbitration agreements, applicable to a contract predating the regulation that contained such an arbitration clause. The

Court stated that "freedom to contract is often diminished when an individual is under governmental regulation." *Ames,* 567 F.2d 1179. *See also, Thorpe v. Housing Authority of the City of Durham,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969) (upholding retroactive application of HUD regulation requiring a city housing authority to give tenants notice of reasons for eviction even though contract between city and HUD contained no such obligation); *F.H.A. v. The Darlington, Inc.,* 358 U.S. 84, 94, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958) ("Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative object.")

Application of the regulations promulgated in May and June, 1980 to these defendants will require them to pay $156,211 instead of $50,000 to a community organization. While this will diminish their profits, this will cause no loss on the project nor will it trigger any personal liability. Although their expectation of receiving an additional $100,000 profit has been affected, they, nevertheless, cannot complain when HPD adjusts and develops its regulatory scheme over time. Private parties who seek to profit from government programs must expect changes in the regulatory system.

Moreover, it is undisputed that the defendants entered into the program with knowledge that this was a spending program the City was administering and that the City intended to return some of the developers' profits back to the community through a qualified community organization. Indeed, the initial advertisement requesting applications from developers made this clear. The defendants, thus, have even less cause for complain that

---

**2.** The defendants' arguments that by participating in the initial closing the City entered into a satisfaction and accord, or waived its contractual rights to force the defendants to pay 2.75 per cent of their mortgage to a community group, must fail. First, since the Court finds that there was never a contract between the parties, there could be no satisfaction and accord or waiver of any contractual rights. Second, even if there had been a contract between the parties based

on the City's April 1980 acceptance of the defendants' proposal, such a contract would not have incorporated the regulations issued later in 1980. The City could not have entered into a satisfaction and accord or waiver of contractual rights based on regulations not in existence when the contract was formed. Thus, the City's participation in the July 2, 1981 mortgage closing is relevant solely on the issue of estoppel, *infra.*

their expectations were diminished by later City action since they knew of the City's goals from the beginning of their project. Therefore, as long as the City's regulations were a rational means of implementing the City's legitimate legislative policy, they must be upheld as to these defendants.

■ The Court concludes that the regulations fixing the minimum amount for a developer's donation were a rational method of achieving the City's objective of returning the profits from public housing developments to the local community. Indeed these regulations were probably necessary, given the lack of incentive for developers to make other than trivial donations to community organizations that of themselves have no bargaining leverage. By requiring defendants to contribute the $156,211 minimum, the defendants are not being denied a right to profits from a government spending program without due process of law.

The defendants' final contention is that the City is estopped from enforcing the 1980 regulations against the defendants because the defendants reasonably, forseeably and detrimentally relied on the City's representations that any sum of money would be sufficient to satisfy the City's donation requirement.

■ Although a standard for the circumstances in which a municipality may be estopped from enforcing one of its regulations against a private party has never been clearly articulated, it is well-established that such circumstances are severely limited. Only when there is "misconduct" by the municipality or when there would be a "manifest injustice" is the City estopped from taking action in its governmental capacity. *See, Hamptons Hospital and Medical Center v. Moore,* 52 N.Y.2d 88, 436 N.Y.S.2d 239, 241, 417 N.E.2d 533, 538 (1981) ("The doctrine of estoppel is not applicable to the State acting in a govern-

mental capacity"); *Keating v. Carey,* 706 F.2d 377, 382 n. 6 (2d Cir.1983) ("a governmental agency promulgating rules or making decisions in its governmental capacity cannot be equitably estopped from reconsidering prior agency decisions simply by virtue of plaintiff's reliance on earlier decisions").[3] *Compare, Eden v. Board of Trustees of State University,* 49 A.D.2d 277, 374 N.Y.S.2d 686, 692 (1975) ("the courts must weigh the degree of manifest injustice against the effect in the particular case, of intervention into the public processes.")

■ The instant case does not involve "misconduct" by the City. Defendants' conclusory allegations to the contrary, based solely upon the fact that the City did not formally rule in advance on whether the project's proposal met the City's requirements, are insufficient to raise an issue of fact for trial.

Nor is there such "manifest injustice" in holding defendants to the 1980 regulations as would warrant the Court interfering in the governmental processes involved. This is not a case where the City has made an affirmative and unequivocal representation that it has reneged on, resulting in an egregious detriment to a private litigant. Rather the City, early in the administration of the program, notified the defendants that a community organization donation was required. Later the City promulgated regulations specifying precisely the minimum donation that the City would require. The City never formally approved the defendants' agreement with the Hudson Piers Development Council nor made any affirmative representation to defendants that a $50,000 donation would suffice. Moreover, this is not a case where enforcing the regulation would work an undue hardship on defendants who profited in excess of the $156,211 required as a donation. Therefore, in the circumstances of this case, the

---

**3.** The Court also notes that the federal courts have been equally reluctant to apply the doctrine of estoppel against the federal government. In *United States v. RePass,* 688 F.2d 154, 158 (2d Cir.1982), the Court of Appeals for the Second Circuit stated that equitable estoppel is not available as a defense against the United States except in the most serious of circumstances and in *Heckler v. Community Health Services,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1983) the Supreme Court reiterated that private parties cannot assert an estoppel against the federal government under the same terms as against private litigants.

City is not estopped from enforcing the 1980 regulations.

## CONCLUSION

After a careful evaluation of the legal arguments and potential factual disputes advanced by the defendants in opposition to the City's motion for summary judgment, the Court concludes that the defendants have not demonstrated that this case presents a genuine dispute of material factual issues requiring a trial on the merits.

The disposition of the counterclaim for damages allegedly caused by the City's prohibition against participating in City programs turns on the Court's determination of plaintiff's motion for summary judgment on its claim. Defendants concede that if they owe $156,211 pursuant to the 1980 regulations then the City may properly bar them from further participation in City programs until the default is cured. The Court need not consider the City's assertion that the counterclaim is barred for lack of timely filing since it is dismissed upon the Court's conclusion that defendants must pay $156,211 to a qualified community organization approved by the City or to an HPD escrow account.

SO ORDERED.